AO 91 (Rev. 11/11) Criminal Complaint

**FILED**

SEP 28 2023

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

# UNITED STATES DISTRICT COURT
for the

Eastern District of North Carolina

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 5:23-mj-2147-JG |
| MARK JAMES MELAND | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____SEE BELOW_____ in the county of _____Cumberland_____ in the

_____Eastern_____ District of _____North Carolina_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. Section 1956(h)<br>Title 21 U.S.C. Sections 331(a) and 333(a)(1) | Conspiracy to Commit Money Laundering — MARCH 22, 2022<br>Introduction of Misbranded Drugs into Interstate Commerce — FEBRUARY 8, 2023 |

This criminal complaint is based on these facts:

See attached affidavit of Special Agent Jeffrey Gruppo

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jeffrey Gruppo, Special Agent FDA-OCI
*Printed name and title*

Attested to by the complainant in accordance with the requirements of Fed. R. Crim. P. 4.1 over the telephone.

Date: __28 SEPT. 2023__

_____
*Judge's signature*

City and state: _____Raleigh, NC_____

United States Magistrate Judge, James E. Gates
*Printed name and title*

NOTE: HANDWRITTEN REVISIONS AT COMPLAINANTS DIRECTION.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NORTH CAROLINA

### AFFIDAVIT IN SUPPORT OF A
### CRIMINAL COMPLAINT AND ARREST WARRANT

I, Special Agent Jeffrey Gruppo, being duly sworn, depose and state that:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the United States Food and Drug Administration (FDA), Office of Criminal Investigations (OCI) (hereinafter, "FDA-OCI"), in the Miami Field Office.  As a Special Agent with the FDA-OCI, I am responsible for investigating violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. (FDCA) and other applicable violations of Title 18 of the United States Code.  I have been a Special Agent with the FDA-OCI since July 2019. My previous law enforcement experience was with the United States Department of Defense, Pentagon Force Protection Agency (PFPA) for eight years as a Special Agent. During that time, I spent nearly five years assigned to the Federal Bureau of Investigation's Joint Terrorism Task Force.  Prior to that position, I worked for PFPA as a Police Officer for approximately four years.

2.    During my career, I have received extensive training and conducted various types of investigations including, but not limited to, wire and mail fraud, financial crimes, terrorism violations, as well as threatening communications over wire.  I have gained experience executing search and arrest warrants for a variety of federal violations, including violations of the FDCA.  I have experience conducting internet-related investigations and am familiar with the tactics and methods people

use over the internet to further their criminal activity. I have completed specific training concerning the FDCA and investigating violations of the FDCA.

3. The facts and information contained in this affidavit are based upon my training and experience, personal knowledge, and observations during this investigation, as well as the observations of other agents involved in this investigation. This affidavit contains only the information necessary to support probable cause, and it is not intended to include each and every fact and matter observed by me or known to the government. I have set forth only those facts that I believe are necessary to establish probable cause.

4. I make this affidavit in support of a criminal complaint and arrest warrant for **MARK JAMES MELAND.** Based on the information detailed below, I submit that there is probable cause to believe that beginning in or around September 3, 2021, and continuing through at least September 19, 2023, **MARK JAMES MELAND** violated 18 U.S.C. §1956(h) (conspiracy to commit money laundering); and 21 U.S.C. §§ 331(a) and 333(a)(1) (introduction of misbranded drugs into interstate commerce).

## II.   REGULATORY FRAMEWORK

5. The United States Food and Drug Administration is the federal agency charged with the responsibility of protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. Among other responsibilities, the FDA enforces laws and regulations regarding the

2

manufacture and distribution of drugs, including prescription drugs, shipped or received in interstate commerce, as well as the labeling of such drugs.

6.      The FDCA defines a "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," "articles (other than food) intended to affect the structure or any function of the body of man," and "articles intended for use as a component of" a drug. 21 U.S.C. § 321(g)(1)(B) and (C) and (D).

7.      Under the FDCA, "label" is defined as "a display of written, printed, or graphic matter upon the immediate container of any article." 21 U.S.C. § 321(k). The term "labeling," in turn, is defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

8.      The FDCA defines interstate commerce as: "(1) commerce between any State or Territory and any place outside thereof, and (2) commerce within the District of Columbia or within any other territory not organized with a legislative body." 21 U.S.C. § 321(b).

9.      "Prescription drugs" are drugs that, because of their toxicity and other potential for harmful effects, or the collateral measures necessary for their use, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(l)(A). A drug also is a prescription drug if the FDA requires it to be administered under the supervision of a practitioner

3

licensed by law to administer such drug as a condition of the FDA's approval of the drug. 21 U.S.C. § 353(b)(l)(B).

10.    "Adequate directions for use" means directions under which a layman can use a drug safely for the purposes for which it is intended. 21 C.F.R. § 201.5.

11.    Under the FDCA, upon first engaging in the manufacture, preparation, propagation, compounding, or processing of a drug, every person is required to immediately register with the FDA such person's name, places of business, all establishments owned or operated by such person, the unique facility identifier of each establishment, and a point of contact email address. 21 U.S.C. § 360(b)(1) & (c).

12.    The terms "manufacture, preparation, propagation, compounding, or processing" include repackaging or otherwise changing the container, wrapper, or labeling of any drug package in furtherance of the distribution of the drug from the original place of manufacture to the person who makes final delivery or sale to the ultimate consumer. 21 U.S.C. § 360(a)(1).

13.    Under the FDCA, a drug is misbranded if, among other things:

    a.  it is manufactured, prepared, propagated, compounded, or processed in an establishment in any State not duly registered with FDA. 21 U.S.C. § 352(o); or

    b.  its labeling is false or misleading in any particular. 21 U.S.C. § 352(a);

    c.  it is in package form and it does not bear a label containing the name and place of business of the manufacturer, packer, or distributor. 21 U.S.C. § 352(b); or

4

d.  its labeling fails to bear adequate directions for use. 21 U.S.C.
§ 352(f)(1).

14.    The FDCA prohibits, among other things, introducing or delivering for introduction, or causing the introduction or delivery, into interstate commerce any misbranded drug.  21 U.S.C. § 331(a).

## III.   PROBABLE CAUSE – Misbranded Drugs

15.    As will be shown below, there is probable cause to believe that **MARK JAMES MELAND** committed the crime of introduction of misbranded drugs into interstate commerce, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1), which occurred in the Eastern District of North Carolina.

16.    Based on my review of records, law enforcement reports, conversations with other law enforcement officers or agents, witness interviews, and my own knowledge of the investigation, I am aware of the following:

## A. SUBJECT BUSINESSES

17.    Mark James Meland is an individual living in the Middle District of North Carolina, with his primary residence located at 192 Rosalyn Road Rockingham, NC 28379 ("Subject Residence").

18.    Meland is the registered owner of Copy Proz, a printing/copying business in Rockingham, North Carolina.  The business was registered in 2018, with the principal address, at the time of filing, listed as "607 A East Broad Ave Rockingham NC 28379."

5

19. Meland is also the registered business owner of Madison James Research. The North Carolina business certificate, filed on September 3, 2021, lists the nature of the business as "supplement research," with the address "607-A East Broad Ave., Rockingham, NC 28379."

20. Both Copy Proz and Madison James Research are currently being operated out of 504-C East Broad Ave. Rockingham, NC 28379. Meland also operates a third business, Marks Gun and Ammo, in a consecutive suite as this location (Suites A-C) (collectively, "Subject Premises").

**B. SUBJECT WEBSITE**

21. Meland's company, Madison James Research, is linked to the website www.madisonjamesresearchchems.com ("Subject Website"). Based on my training and experience, I recognized the Subject Website as an e-commerce website that offered a variety of FDA-regulated products for sale. The products include drugs, as defined by the FDCA.

22. From at least September 2021 through September 2023, Meland used the Subject Website to offer a variety of products for sale, which contain well-known active pharmaceutical ingredients ("API") and fall under the FDCA definition of "drug," as described below, including:

    a. "Tadalafil/Sildenafil Capsules" are capsules marketed on the Subject Website as containing 25mg each of Tadalafil and Sildenafil. An image of a bottle of this product is displayed on the website. That image indicates that it contains "60 capsules." A "Research Facts" panel on

6

that label displays the "Amount" as "2 Capsules" and the "Amount per Bottle" as "30 Capsules."

b. "Modanifil," are capsules marketed on the Subject Website as follows: "Modafinil reduces extreme sleepiness due to narcolepsy and other sleep disorders." The Subject Website also claims that "this medication does not cure these sleep disorders and may not get rid of all your sleepiness. Modafinil does not take the place of getting enough sleep."

c. "GLP-1 Semaglutide" is marketed as follows: "it's primary physiologic function is to lower blood sugar levels by naturally enhancing insulin secretion . . . and has been linked with neurotrophic effects in the brain and central nervous system . . . has been shown to significantly decrease appetite by delaying gastric emptying and reducing intestinal motility." The Subject Website also notes that "GLP-1 research has been in the realm of diabetes treatment/prevention as well as appetite suppression" and that "research focuses on the ability of GLP-1 to stave off neurodegenerative disease."

23. Despite marketing the above products and other drugs containing API in capsule and injectable form,[1] the Subject Website (and the labels on the drugs) contains a number of disclaimers that the aforementioned products are not for human use and are for research purposes only. Among those disclaimers are:

---

[1] The Subject Website also markets several products in powder form marketed as "Research Powders," including Tadalfil, Sildenafil, Tamoxifen, and Finesteride; products marketed as injectable, including the GLP-1 Semaglutide Injectable 7-Keto DHEA; and products marketed in liquid form, including Tadalafil/Sildenafil Combo, Finasteride, and Albuterol.

7

a. "This product is intended for laboratory research use only"

b. "This product is NOT for human use and can be harmful if ingested"

c. "This product is not a drug, food, or cosmetic and should not be misbranded, misused or mislabeled as a drug, food or cosmetic"

d. "is intended for educational/informational purposes only"

e. "This designation allows the use of research chemicals strictly for in vitro testing and laboratory experimentation only"

f. "Bodily introduction of any kind into humans or animals is strictly forbidden by law"

g. "Research chemicals are use only to see chemical reactions, solubility test and reagent test."

## C. FDA ORANGE BOOK

24. The FDA maintains the publication *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"). The publication is publicly available on the FDA's website,[2] and includes a searchable database of drug products approved by the FDA.

25. The FDA also maintains a publicly available database through their official website, that allows a user to query various information about drug approvals. This database is commonly known as Drugs@FDA.[3]

---

[2] https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book

[3] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm

8

26.     According to the Orange Book and Drugs@FDA,[4] the following was noted about the products previously referenced in this affidavit as available on the Subject Website:

a.  Tadalafil is an API in several FDA-approved drugs intended to treat erectile dysfunction, including a drug marketed under the proprietary name Cialis.  Cialis, and the other FDA-approved drugs containing Tadalafil, are prescription drugs.

b.  Sildenafil Citrate is an API in several FDA-approved drugs indicated for the treatment of erectile dysfunction, including a drug marketed under the proprietary name Viagra.  Viagra and the other FDA-approved drugs containing Sildenafil Citrate are prescription drugs.  Sildenafil Citrate is also an API in the FDA-approved prescription drug, Revatio, which is indicated for treatment of pulmonary arterial hypertension.

c.  There was no match in the Orange Book for "Modanifil," as written on the Subject Website.[5]  However, there were matches for Modafinil, which is an API in several drugs, including drugs marketed under the proprietary names Provigil and Nuvigil.  These drugs are indicated to improve wakefulness in adult patients with excessive sleepiness associated with narcolepsy, obstructive sleep apnea, or shift work disorder.  Provigil, Nuvigil and other FDA-approved drugs containing Modafinil, are prescription drugs.

---

[4] Websites last reviewed on August 15, 2023.
[5] It is believed the Subject Website has a misspelling of the product Modafinil as "Modanifil."

9

d. Semaglutide, is an API in FDA-approved drugs commonly marketed under the proprietary names Ozempic, Wegovy, and Rybelsus, which are prescription drugs. The approved dosage form for Ozempic and Wegovy are as subcutaneous solutions. The approved dosage form for Rybelsus is a tablet.

27.    According to FDA records, neither Meland nor his businesses or properties are registered with the FDA as engaged in the manufacture, preparation, propagation, compounding, or processing of drugs.

**D. GOOGLE SEARCH WARRANT**

28.    On or about May 10, 2023, a search warrant was issued out of the Eastern District of North Carolina to search Google accounts associated with Madison James Research and Copy Proz ("Subject Email Accounts"). A review of the records revealed the following:

29.    Despite the "disclaimers" on the Subject Website, numerous emails contained discussions with customers about how to use the drugs, their intended use, and dosage. For example:

a. In a September 29, 2021 email chain, a customer asked "My bottle of collagen says for research only not human consumption?" Madison Jamesresponded: "Yes, we put that on all products to protect ourselves from the FDA. All research companies do as well."[6]

---

[6] Response from email address: madisonjamesresearch@gmail.com.

b. In an October 11, 2022 email chain, a customer stated "Hey guys, Just wanted to let you all know that you may want to check the quality control of your glp-1 semaglutide 10mg. On my last two orders, the most recent one and the one prior, the compound did not work. At the normal 2.4 mg dose, there was no feeling of fullness or delayed gastric emptying. My appetite was the same before, during and after administration. I even upped the dose both times to 5mg (.5cc after dilution with 1cc bac water,) and nothing. Not looking for any freebies or anything, just bringing it to your attention in case you guys got a bad batch or something. Everything else I ordered worked fine. Thanks" Madison James responded: "What color were the tops on the vials?"

30.    The emails also contained discussions with customers about intended use specific to Tadalafil/Sildenafil products, including:

a. In an email chain beginning on December 7, 2022, a customer asked "Hello! I just wanted to confirm the serving on a couple of products as there seems to be a discrepancy on the website. The Tadalafil/Sildenafil bottle on the website shows 2 capsules per serving, but the description says "Tadalafil 25mg/Sildenafil 25mg x 60 capsules" which seems to indicate EACH capsule has 25 mg of each? The label on the bottle seems to indicate its 12.5mg of each per pill? Does 1 capsule contain the full dose? Or will 1 capsule just be a half dose? Also, for the ECA, the image of the bottle says the Serving size is 2 Capsules, but the description says

11

the serving size is 1 capsule? Does 1 capsule contain the full dose? Or will 1 capsule just be a half dose? I remember taking these both probably 5-6 years ago and I remember the serving size being 1 capsule? Just want to make sure I dont under or worse over dose. Thanks in advance for your help!" Madison James responded, "Should be one capsule per serving for all."

b. In an email chain beginning on, or about, March 18, 2020, a customer inquired, "Hello can I place and order for Tadalafil/Sildenafil capsules?" Madison James responded "Absolutely." After talking about the cost, the customer inquired, "Which are your stronger capsules ... last one I got wasn't strong compared to previous? Just curious." Madison James responded, "Sild caps."

31. In addition to the sale and distribution of drugs through the Website, email records provide evidence of Madison James Research manufacturing products for the Subject Website. For example, in an email chain in November 2021, a customer inquired into how many capsules Madison James Research can make at one time. The email response from madisonjamesresearch@gmail.com was: "600 in 15 minutes…" "I have 6 of the semiautomatic machines."

32. Finally, the emails (and shipping records) establish that Meland shipped products from the Subject Website to customers in the Eastern District of North Carolina, including:

12

a. Order Number 37323: two orders of GLP-1 Semaglutide 5mg, for a total price of $170.00, shipped to a customer with an address on Sherrod Drive in Fayetteville, North Carolina in January 2023;

b. Order Number 38941: Clenbuterol 250mcg x 30ml and YK-11 Injectable, for a total price of $105.20, shipped to a customer on Star Ridge Drive in Raleigh, North Carolina in March 2023;

c. Order Number 39129: Tadalafil Capsules, for a total price of $72.80, shipped to a customer with an address on Southwalk Lane in Raleigh, North Carolina in April 2023; and

d. Order Number 39048: GLP-1 Semaglutide 10mg and Modanifil Capsules, for a total price of $197.00, shipped to a customer on Yorkgate Drive in Raleigh, North Carolina in April 2023.

33.    Records from Ship Station, a web-based shipping company, shows 145 labels were made for packages shipped by Meland to addresses in Raleigh, and 29 for addresses in Fayetteville, North Carolina.  Packages shipped by Meland through USPS or FedEx were typically processed through distribution centers in Fayetteville.

**E. UNDERCOVER PURCHASE**

34.    On or about February 7, 2023, your affiant made an undercover purchase of products ("UC purchase") from the Subject Website.  The purchase included the products GLP-1 Semaglutide 10mg, Tadalafil/Sildenafil capsules, and Modanifil capsules.  A prescription was not required to complete the purchase and no prescription was provided.  The payment method chosen for the purchase was "secure

13

credit card processing." The order was identified as number 37900. An invoice was later received by email from a third-party company, Hoover Pilot Car Service, which referenced Madison James Research invoice number 37900, and payment was made by an undercover credit card.

35. A week later, your affiant received the products from the UC purchase. The products had been shipped interstate through the United States Postal Service, from North Carolina to Florida. Tracking records show the package entered the Eastern District of North Carolina by way of a USPS distribution center in Fayetteville. The package's return address was "C.P. 607A East Broad Avenue Rockingham NC 28379," known by your affiant as Meland's Copy Proz address.

36. The Tadalafil/Sildenafil and Modanifil products were shipped in black plastic bottles and the GLP-1 Semaglutide was a white powder in a glass ampule. The labels on all three products were branded as "MJR Laboratories." The labels did not include the place of business of the manufacturer, packer or distributor. More specifically, the labels did not include the city, state or country for MJR Laboratories or for any other firm. None of the labels or labeling included in the shipment for these products contained any directions for use.

37. Despite the Tadalafil/Sildenafil product being marketed on the Subject Website and shipped in capsule form, the bottles contained various disclaimers similar to those described above in paragraph 23, including "Research Compound Not for Human Consumption." The Modanafil and Tadalafil/Sildenafil labels identified

14

the products as "research product." The GLP-1 Semaglutide did not contain any disclaimers on the label. The images below are of the items as they were received.





 

38.     Based on your affiant's review of the products ordered and received from the Subject Website, the products were misbranded in the following ways: they were manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered with FDA; their labeling was false and misleading; they were in package form and did not bear a label containing the place of business of the manufacturer, packer, and distributor; and their labeling failed to bear adequate directions for use.

## IV.  PROBABLE CAUSE – Money Laundering

39.     As will be shown below, there is probable cause to believe that **MARK JAMES MELAND** committed the crime of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), which occurred in the Eastern District of North Carolina.

40.     Based on my review of records, law enforcement reports, conversations with other law enforcement officers or agents, witness interviews, and my own

16

knowledge of the investigation, in addition to the information described above, I am aware of the following:

41.     The Drug Enforcement Agency publishes the *Lists of Scheduling Actions, Controlled Substance, Regulated Chemicals*, which is commonly referred to as an "orange book." According to the publication dated July 2023, products for sale on the Subject Website are categorized by the DEA as controlled substances. For example, Modafinil, which was purchased as part of the UC Purchase described above, is listed as a Schedule IV controlled substance.

42.     In addition, probable cause exists that the Subject Website is being used to conceal the sale and distribution of additional controlled substances.

### A. SECOND UNDERCOVER PURCHASE

43.     On or around July 31, 2023, your affiant, using an undercover email address, initiated a conversation with Madison James Research.[7] In this email exchange, Madison James offered to sell your affiant 10 bottles of "test" for $200. Your affiant understood "test" to be a reference to testosterone, a Schedule III controlled substance. The email from Madison James instructed your affiant to make a purchase on the Subject Website for an equivalent amount of product. Your affiant understood this to be an effort to disguise the nature of the product being sold. Madison James indicated that once the invoice was paid for the substitute products purchased on the Subject Website, the "test" would be shipped in lieu of the products ordered.

---

[7] Correspondence through email address: madisonjamesresearch@gmail.com.

44.     Following these instructions, on or about August 2, 2023, your affiant placed an order for two bottles of Tadalafil/Sildenafil and two bottles of Tamoxifen from the Subject Website, which equaled $200.

45.     An invoice was subsequently received from Hoover Pilot Car Service, with the invoice line stating "MJR-Base Price (1)." Payment in the amount of $208.00 (including shipping) was made to Hoover Pilot Car Service through a UC credit card.

46.     The purchase was received on or about August 8, 2023.  It contained 10 vials that were labeled as "TESTOSTERONE ENANTHATE 300mg" at 10ml each vial.  The vials' labels displayed the brand FITZ Scientific. They did not display an "RX Only" statement but did state "DR. AUTH REQUIRED."

47.     The package's return address was "C.P. 504C East Broad Avenue Rockingham NC 28379" (SUITE C). The products had been shipped interstate through the United States Postal Service, from North Carolina to Florida.

48.     On or about September 15, 2023, the FDA Forensic Chemistry Center lab testing confirmed the vials contained testosterone enanthate (a Schedule III controlled substance). No additional APIs, controlled substances, or steroids were identified in the product; however, vegetable oil was also identified as an ingredient.

**C. SERACH WARRANT**

49.     On September 20, 2023, law enforcement executed a search warrant at Meland's business locations and residence in Rockingham, North Carolina.  Law enforcement agents found evidence of manufacturing, packaging, and shipping controlled substances from these locations.

18

50.     In particular, when law enforcement entered "Suite A," one of three business office suites occupied by Meland, containers labeled as controlled substances were found inside safes. The contents of these containers have not yet been analyzed, but the preliminary evidence suggests Meland stored controlled substances, and products commonly known to be mixed with controlled substances, in these locations for use in his illegal drug shipments.

51.     Dozens of bottles containing liquids were seized from this location. Many of the bottles were clearly labeled with names your affiant recognizes as references to Schedule III controlled substances, specifically testosterone and steroids. In a preliminary review of the evidence seized, the below items contained labels (either the medication name, brand name, or commonly used nickname) recognized as Schedule III controlled substances:

a. 21 bottles with labels for Sustanon (Testosterone isocaproate)

b. 12 bottles with labels for Testosterone Enanthate (Test E)

c. 11 bottles with labels for Primobolan (Metenolone enanthate)

d. 10 bottles with labels for Tren A (Trenbolone)

e. 4 bottles with labels for Winstrol (Stanozolol)

f. 4 bottles with labels for Anavar (Oxandrolone)

g. 4 bottles with labels for Deca-Durabolin  (Nandrolone)

52.     In addition to controlled substances in liquid form, law enforcement also seized hundreds of small silver bags containing cuspules. These packaged bags also contained labels recognized as controlled substances, including 390 bags with labels

19

for Dianabol (Methandienone), 12 bags labeled as Winstrol, nine bags labeled as Primbolan, and six bags labeled as Sustanon.

53.     The search also identified a number of components of manufacturing, such as capsules and packaging materials. Meland made unprotected statements to law enforcement that he used grapeseed oil to manufacture testosterone and steroids. Nearly a dozen bottles labeled "grapeseed oil" were seized from Suite A. He also admitted to making the liquid products, to include testosterone and steroids, at his house in Rockingham, North Carolina. He indicated that he had been operating Madison James Research for at least the past eight years.

54.     In addition to finding controlled substances and component parts during the search, law enforcement officers also seized $169,983 in cash from Meland's residence and businesses.

**B. GOOGLE WARRANT**

55.     As noted above, on or about May 10, 2023, a search warrant was issued to search Google accounts associated with Madison James Research and Copy Proz. These records provide further evidence of Meland's drug distribution through Madison James Research and efforts to conceal the nature of his business.

56.     The Google records revealed attempts to hide the nature of the Madison James Research business. Instructions were given to website customers to use deceptive descriptions of the Subject Website orders, in order to not be scrutinized by payment processors. For example:

20

a. In an email chain beginning on April 18, 2023, Madison James provides instructions for payment through Venmo and states "Please put for Groceries Donation No Order Numbers. Venmo shuts us down when they see stuff about orders. Just payment and email it to us! Any order info your payment will force us to refund and delete your order. Thanks."

b. In an email chain beginning on April 19, 2023, Madison James also instructed for a customer to state the purchase was related to "Groceries Donation," for a payment being made through the processor CashApp.

c. On or about January 20, 2023, an order confirmation was sent to the purchaser "Matt Houser" for Tadalafil Capsules. Houser was a repeat customer of Madison James Research and was previously instructed to use "Groceries Donation" as a description for a purchase he made through Venmo in September 2020.

57. Records obtained from Venmo corroborate information uncovered in the Google search. Between March 2020 and December 2022, there were more than 1,750 separate Venmo transactions totaling more than $334,000 paid to the Venmo accounts of Nancy Hoover (Hoover Pilot Car) and Mark Meland that included notes with deceptive descriptions, including, but not limited to: "Grocery Donation," "Furniture," "Dance Lessons," "Pizza," "Textbooks," and "School Supplies."

58. The email account records also showed Madison James Research in regular communication, by email, with an individual identified as Noah Rasdon. Rasdon is the owner of the business Magic Nutrition, a vitamin supplement shop

21

located in Arkansas, and was one of Meland's largest customers. Rasdon frequently sent orders for a variety of products, often controlled substances, on behalf of third-party customers. Rasdon provided Meland with the names of products, the quantities of products, and shipping instructions, including a name and address of the third-party. These orders were subsequently filled and sent via FedEx package to Rasdon, or the third-party customer directly. The emails confirm Rasdon ordered controlled substances through Madison James Research and sent money to Meland for them. For example:

a. On or about August 1, 2022, Rasdon sent an order to Madison James Research on behalf of Ray Koga. The order included 50 units of Testosterone Enanthate (300mg), 50 units of Anavar, 50 units of Winstrol, 50 units of Anadrol, and 50 units of D-Bol[8] (all Schedule III controlled substances). According to FedEx, two packages were sent from Mark Meland to Ray Koga in Nampa, ID on August 1, 2022. According to Bank of America, Magic Nutrition sent an ACH transfer to Meland's Copy Proz bank account on August 1, 2022 for $6,964 and on August 3, 2022 for $5,420. All of the proceeds of this order appear to be from the sale of controlled substances.

b. On or about December 7, 2022, Rasdon sent an order to Madison James Research on behalf of Dallas Dierlam in Corpus Christi, TX. The order

---

[8] Based on my training, experience, research, and familiarity with Madison James Research, I recognize this as a commonly used nickname for Dianabol, a Schedule III controlled substance.

22

included four packs of Tren A[9] and 3 packs of Winny[10] (both Schedule III controlled substances). According to FedEx, a package was sent from Meland to "Dalla Dierlam" in Corpus Christi, TX on December 8, 2022.

c.  On or about March 1, 2023, Rasdon sent an order to Madison James Research on behalf of Brandon Kelly. The order included seven units of Deca[11], 40 units of Test E[12], four units of Anadrol, four units of Dbol, and four units of Winstrol (all Schedule III controlled substances), among other items. According to FedEx, a package was shipped from Meland to Brandon Kelly in Porter, TX on March 17, 2023.

d.  In an email chain starting on or about March 1, 2023, Rasdon sent an order to Madison James Research on behalf of John Ugent. The order included 50 units of Deca, 30 units of Tren A, and 100 units of Test E (Schedule III controlled substances). According to FedEx, a package was shipped from Meland to John Ugent in Miami, FL on March 15, 2023.

e.  On or about March 22, 2023, Rasdon sent an order to Madison James Research on behalf of Ray Koga, with the subject line "Ray Special Order Shipped to Ray." The order included 300 units of Test E and 100 units of Anavar (both Schedule III controlled substances). According to FedEx,

_____

[9] Based on my training, experience, research, and familiarity with Madison James Research, I recognize this as a commonly used nickname for Trenbolone.
[10] I recognize this as a commonly used nickname for Winstrol.
[11] I recognize this as a commonly used nickname for Deca-Durabolin.
[12] I recognize this as a commonly used nickname for Testosterone Enanthate.

23

73 packages were shipped from Meland to Ray Koga in Nampa, ID on March 24, 2023.

f.  On or about March 29, 2023, Rasdon sent an order to Madison James Research on behalf of John Ugent. The order included 50 units of Test E and 50 units of Anavar (both Schedule III controlled substances). According to FedEx, Meland sent a package to Ugent in Miami, FL on March 31, 2023.

g.  On or about April 10, 2023, Rasdon sent an order to Madison James Research on behalf of Mike J in Coalgate, OK. The order included 25 units of Test E, 15 units of Dbol, and 15 units of Winny (all Schedule III controlled substances). According to FedEx, Meland sent a package to Mike J in Coalgate, OK on April 13, 2023.

h.  On, or about, April 18, 2023, Rasdon sent an order to Madison James Research on behalf of Justin Abbott in Cabot, Arkansas. The order included five units of Tren A (a Schedule III controlled substance). According to FedEx, Meland sent a package to Justin Abbott in Cabot, AR on April 19, 2023.

59.  Rasdon would also place bulk or wholesale orders with Meland to be delivered to Rasdon, instead of third-party customers, which also included controlled substances. For example:

a.  In an email chain beginning on or about January 5, 2022, Rasdon placed an order with Meland that included 40 units of Test E, 50 units of Test

24

C, 25 units of Test P, 10 units of Tren E, 10 units of Tren A, 10 units of Dbol, five units of Anadrol, 20 units of Anavar, and five units of Winstrol (all Schedule III controlled substances). The subject line of the email read: "Order To Be Expressed To Me." According to FedEx records, Meland shipped a package to Rasdon in Alma, AR on January 7, 2022.

 b. In an email chain beginning on or about January 25, 2022, Rasdon placed an order with Meland that included 50 units of Test E, 40 units of Test C, 20 units of Test P, 15 units of Tren A, and 25 units of Tren E (all Schedule III controlled substances). Meland later provided a copy of the FedEx shipping label addressed to Noah Radson in Alma, AR.

 60. Meland and Rasdon also discussed payment methods in email, particularly about making ACH payments to an account Meland held at Bank of America. In an email chain beginning on or about December 7, 2021, Rasdon indicated he was having issues with payment processing and inquired about making ACH transfers to Meland. Meland replied with a copy of a check from Bank of America in the name of Mark Meland Sole Prop DBA Copy Proz.

 61. During the execution of the search warrant, Meland made statements to law enforcement regarding his financial relationship with Rasdon and Magic Nutrition. Meland confirmed he received orders from Rasdon on behalf of other customers. He stated that he would ship these products to the customers, and then receive proceeds from Rasdon for the purchase.

## D. BANK OF AMERICA RECORDS

62.      Investigators received Bank of America records pertaining to accounts held by Meland and his businesses. Meland opened an account under the business name "Mark Meland Sole Prop DBA Copy Proz," on or about March 19, 2019 (BoA Account *1366). The bank records show that this account received over $768,000 in credits from Magic Nutrition (Noah Rasdon) between February 2022 and June 2023.

63.      The Bank of America records revealed that Magic Nutrition made at least 95 ACH payments to Meland's Copy Proz Account beginning in February 2022 and through June 2023.[13] Beginning in June 2023, Rasdon began sending wires to Meland from an account held in Rasdon's personal name. Approximately $89,000 was wired from Rasdons' personal account to Meland's Copy Proz Account between June and August 31, 2023.

64.      Between August 1, 2022 and April 18, 2023, Bank of America records show that Meland transferred no less than $369,000 from his Copy Proz Account to his Personal Bank Account (BoA Account *0007). Additionally, during this same time frame, Meland transferred no less than $112,295 from his Copy Proz Account to his MJR Bank Account. For example:

> a.    On October 27, 2022, a $100,000 transfer was made from Meland's Copy Proz Account to his Personal Account. On the same day, Meland wired $100,704 from his Personal Account to Prestige Motor Car Imports.

---

[13] Prior to this time, seven wires were sent from Magic Nutrition to Meland between December 2021 and February 2022, for a total of $29,550.

b. On January 10, 2023, two transfers were made from his Copy Proz Account to his Personal Account for $100,000 and $119,000. Meland then sent a wire for $449,496.48 from his Personal Account to Williams Deane and Herndon, at First Bank, with the reference "PHFMKRJXR /ACC/Closing for Meland." On the same day a deed was filed in Richmond County, NC for a property located at 192 Rosalyn Rd. Rockingham, NC 28379. The deed identified Meland as the Grantee and was filed by Williams, Deane & Herndon.

c. On February 3, 2023, a transfer was made from Meland's Copy Proz Bank Account to his MJR Bank Account for $50,000. On this same day, a check cleared the MJR Account for $45,000 (check dated February 2, 2023). This check was written to Diffenbach Superstore. The memo line read "Truck Down Payment."

## E. FINANCIAL TRANSACTIONS

65. A review of financial records for Meland show multiple purchases of vehicles and properties with the proceeds derived from the Subject Website and the sales of controlled substances concealed through the Website. In particular, Meland purchased a home in the Eastern District of North Carolina, with the deed in his brother's name, in March 2022 using funds from his personal and business accounts, which as described above, contained proceeds from the distribution of drugs.

27

a. On February 22, 2022, Mark Meland wrote a check for $10,000, drawn on his Copy Proz Account, to Jagjit Mehmi and Baijit Kaur. The memo line stated: "Due Diligence."

b. On March 22, 2022, a $220,000 transfer was made from the Copy Proz Account to Meland's Personal Account. On the same day, Meland withdrew $414,065.64 from his Personal Account and purchased a Cashier's Check, payable to The Webb Law Firm for the purchase of 4812 Addie Lane, Fayetteville, NC, a house located in the Eastern District of North Carolina.

c. The contract to purchase the home at 4812 Addie Lane lists the "Buyer" as Mark James Meland. Meland signed the Offer to Purchase and Contract on February 21, 2022 as the buyer.

d. A North Carolina General Warranty Deed was filed with the Cumberland County Register of Deeds on March 23, 2022, transferring title of Lot 3 Henry's Place (4812 Addie Lane, Fayetteville, NC) from Baijit Kaur to Adam Scott Meland. Investigators identified Adam Meland as Mark Meland's brother.

66.    While the Fayetteville property was in Adam Meland's name, records show that Mark Meland shipped products related to the manufacturing of drugs, products, and controlled substances to this address, including Propylene Glycol and grapeseed oil. During an interview, Meland admitted to law enforcement that he used grapeseed oil to manufacture controlled substances in his home. Email records

28

also indicate that Meland directed his suppliers of controlled substances and other drugs to ship product to the address in Fayetteville on at least one occasion.

67. Financial records show Meland sold the Fayetteville property within months of purchasing it, depositing the funds from the real estate sale into his bank accounts, despite his brother being listed as the property owner.

    a. On May 9, 2022, an offer to purchase 4812 Addie Lane was signed by Adam Meland, seller, and John Braswell, buyer, for a purchase price of $555,000.[14]

    b. On May 10, 2022, Braswell wired $25,000 to Meland's Personal Account. Ashely McGavin[15] transferred an additional $5,000 to this same account.

    c. On June 7, 2022, Hutchens Law Firm, located in Fayetteville, NC, wired $484,335.22 to Meland's Copy Proz Account for proceeds for the sale of 4812 Addie Lane.

    d. A North Carolina Warranty Deed was filed with the Cumberland County Register of Deeds on June 7, 2022, transferring title of "Lot 3, Henry's Place" from Adam Meland to Braswell and McGavin.

68. The funds from this real estate sale were then used to purchase additional property. On June 8, 2022, $501,351.01 was wired from Meland's Copy

---

[14] The offer was subsequently amended on May 29, 2022, to reflect a new price of $545,000.
[15] McGavin was listed on the deed as Grantee with Braswell as Joint Tenants with the Right of Survivorship.

Proz Account to Williams, Deane and Herndon for the purchase of a property in Pinehurst, North Carolina.

69.     Between March 2022 and September 2023, Mark and/or Adam Meland cycled money through multiple real estate transactions, purchasing no less than four different properties.

70.     An additional real estate transaction was identified during the search of Meland's businesses. Agents found a deed in Meland's car for a property purchased on September 12, 2023, in Richmond County, North Carolina, with the Grantee listed as Alexander Meland.

71.     In addition to real estate, numerous vehicles were purchased by Meland with money from his personal and business accounts, including a: 2022 Range Rover, 2023 BMW M8, 2022 Chevrolet Tahoe, a 2022 Mercedes Benz, and a Ford F150.


[Remainder of page intentionally left blank]

## CONCLUSION

75.    Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that **MARK JAMES MELAND** violated 18 U.S.C. § 1956(h) (conspiracy to commit money laundering); and 21 U.S.C. §§ 331(a) and 333(a)(1) (introduction of misbranded drugs into interstate commerce).


Respectfully Submitted,

JEFFREY GRUPPO
Special Agent
Food and Drug Administration
Office of Criminal Investigations


On this _28_ day of _SEPTEMBER_, 2023, Special Agent Jeffrey Gruppo appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Affidavit.


JAMES E. GATES
United States Magistrate Judge

31